USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/17/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

ELIZABETH MANUEL and VIVIEN GROSSMAN, on
behalf of themselves, all others similarly situated, and the
general public,

                                        Plaintiffs,

              -v-

PEPSI-COLA COMPANY,

                                        Defendant.

———————————————————————————

17 Civ. 7955 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves a challenge to the use of the word "diet" in connection with the

ubiquitous soft drink Diet Pepsi. Plaintiffs Elizabeth Manuel and Vivien Grossman bring this

putative class action against defendant Pepsi-Cola Company ("PepsiCo") alleging unfair and

deceptive business practices, false advertising, fraud, negligent misrepresentation, and breaches

of express and implied warranties, all arising under New York law and all based—in whole or

part—on PepsiCo's use of the "diet" adjective to describe this beverage.

Now pending is PepsiCo's motion to dismiss plaintiffs' First Amended Complaint under

Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 27. For the following reasons, the Court

grants PepsiCo's motion and dismisses the complaint in its entirety.

I.      **Background**

        A.      **Factual Background**[1]

_____

[1] The facts related herein are drawn primarily from the First Amended Complaint. Dkt. 24
("FAC"). For the purpose of resolving the motion to dismiss, the Court assumes all well-pled
facts to be true, drawing all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's
Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered the scientific articles
and studies incorporated into the FAC by reference. *See Chambers v. Time Warner, Inc.*, 282
F.3d 147, 152–53 (2d Cir. 2002). Further, the Court has taken notice of a matter of common
knowledge absent from the FAC, but uncontroverted in plaintiffs' opposition brief: that in

In 1964, PepsiCo introduced Diet Pepsi. FAC ¶ 12. Unlike Pepsi, which contains sugar, Diet Pepsi contains no calories. *Id.* ¶ 15. Instead, Diet Pepsi is sweetened with the non-nutritive sweeteners ("NNS") aspartame acesulfame-potassium and sucralose. *Id.* ¶ 1. PepsiCo uses the term "diet" in marketing Diet Pepsi to signal the use of NNS in place of sugar. *Id.* ¶ 15.

Plaintiffs allege that as a result of PepsiCo's use of the term "diet" in marketing Diet Pepsi, "consumers reasonably believe that the product will assist in weight loss, or at least healthy weight management, for example, by not causing weight gain." *Id.* ¶ 16. This belief is misplaced, plaintiffs allege, because "[s]cientific evidence demonstrates [that] nonnutritive sweeteners like aspartame acesulfame-potassium and sucralose interfere with the body's ability to properly metabolize calories, leading to weight gain and increased risk of metabolic disease, diabetes, and cardiovascular disease." *Id.* ¶ 2.

Plaintiffs are long-time purchasers and consumers of Diet Pepsi. *Id.* ¶¶ 53–56. They have also struggled with obesity for many years. *Id.* ¶¶ 54, 56. Absent PepsiCo's false and misleading labeling, they allege, they would not have purchased Diet Pepsi at the price they paid. *Id.* ¶ 57.

### B.  Procedural History

On October 16, 2017, plaintiffs filed the complaint in this action. Dkt. 1. On December 12, 2017, PepsiCo filed a motion to dismiss. Dkt. 17. On December 13, 2017, the Court issued an amend-or-oppose order, directing plaintiffs, by January 9, 2018, to file either an amended complaint or a brief in opposition to the motion to dismiss. Dkt. 19.

---

addition to Diet Pepsi, PepsiCo also markets Pepsi, a soft drink containing sugar. *See Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014) (on motion to dismiss, court may consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence"); *see also* Fed. R. Evid. 201 ("generally known" facts subject to judicial notice).

On January 2, 2018, plaintiffs filed the FAC.  Dkt. 24.  On January 19, 2018, PepsiCo renewed its motion to dismiss.  Dkt. 27 ("Mem.").  On January 31, 2018, plaintiffs filed a memorandum of law in opposition, Dkt. 30 ("Opp."), as well as a declaration in support, Dkt. 31 ("Melamed Decl.").  On February 7, 2018, PepsiCo filed its reply.  Dkt. 33 ("Reply").

Since February, the parties have filed three letters alerting the Court to decisions in related matters.

First, on March 5, 2018, PepsiCo notified the Court of a recent decision by Judge William Alsup of the Northern District of California.  *See* Dkt. 39 (*Becerra v. Coca-Cola Co.*, No. C 17-5916 (WHA), 2018 WL 1070823 (N.D. Cal. Feb. 27, 2018) ("*Coca-Cola*"), *appeal docketed*, 18-15365).

Second, on April 2, 2018, plaintiffs notified the Court of a recent decision by Judge William H. Orrick, also of the Northern District of California.  *See* Dkt. 41 (*Becerra v. Dr Pepper / Seven Up, Inc.*, No. 17-cv-5921 (WHO), 2018 WL 1569697 (N.D. Cal. Mar. 30, 2018) ("*Dr Pepper*")).

And third, on April 19, 2018, PepsiCo notified the Court of a recent decision by Judge George B. Daniels of the Southern District of New York.  *See* Dkt. 43 (*Excevarria v. Dr. Pepper Snapple Grp.*, No. 17-cv-7957 (GBD), ECF No. 54 (S.D.N.Y. Apr. 18, 2018) ("*Excevarria*")).

Each of these decisions dismissed claims substantively identical to those here.  Each did so on essentially the same grounds: that although state-law claims alleging false or misleading use of the word "diet" in soft drink labeling are not preempted by federal law, the plaintiffs there had failed to allege plausibly that reasonable consumers were likely to be deceived by use of the "diet" term.  *See Coca-Cola*, 2018 WL 1070823, at *1–4; *Dr Pepper*, 2018 WL 1569697, at *3–6; *Excevarria*, No. 17-cv-7957 (GBD), ECF No. 56 at 80–84.  Judges Alsup and Orrick went a

step further.  Each held that the scientific studies relied on by plaintiffs failed to supply a causal link between diet soft drink consumption and weight gain, as would be necessary to sustain their claims.  *See Coca-Cola*, 2018 WL 1070823, at *4; *Dr Pepper*, 2018 WL 1569697, at *6–7.

## II.      Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch*, 699 F.3d at 145.  That tenet, however, "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## III.      Discussion

Defendants move to dismiss the FAC on four grounds: that (1) plaintiffs' claims, all arising under New York law, are preempted by federal law; (2) plaintiffs' claims should be dismissed or stayed pursuant to the primary jurisdiction doctrine; (3) plaintiffs have failed to plead actual deception; and (4) plaintiffs' false advertising claim fails to allege causation.  The Court addresses each in turn.

### A. Preemption

In determining whether state-law claims are preempted by federal law, courts look first to congressional intent. *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 180–81 (2d Cir. 2012) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Congress may manifest its intent "explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010).

Where Congress has codified its preemptive intent in statutory form, the court's analysis properly begins with the language of the statute. *23-34 94th St.* at 181. But even where a federal law contains an express preemption clause, a court may still be required to consider implied preemption as it looks to the "substance and scope of Congress' displacement of state law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). To that end, Congress's preemptive intent may be inferred where an actual conflict exists between state and federal law. *Id.* at 76–77.

Nevertheless, "because the States are independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, where there are plausible alternative readings of a preemption provision, courts "have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

Because the preemption inquiry turns first on Congress's intent as manifested by statute, the Court begins with an overview of the federal soft-drink labeling regime. The Court then addresses whether that body of law preempts plaintiffs' claims. For the reasons that follow, the Court holds that federal law does not bar plaintiffs from pursuing, under state law, consumer-protection claims alleging that marketing a soft drink as "Diet" Pepsi is false or misleading.

### 1.     The Federal Labeling Regime

In 1990, Congress amended the United States Federal Food, Drug, and Cosmetic Act ("FDCA") with the Nutrition Labeling and Education Act ("NLEA").  The NLEA specifically addresses use of the term "diet" in soft drink labeling.  It excludes from certain labeling requirements (and thereby authorizes) use of the term "diet" on a soft drink label where: "(i) such claim is contained in the brand name of such soft drink, (ii) such brand name was in use on such soft drink before October 25, 1989, and (iii) the use of the term 'diet' was in conformity with [21 C.F.R. § 105.66]."  21 U.S.C. § 343(r)(2)(D).  At the time, 21 C.F.R. § 105.66 provided that soft drinks could be labeled "diet" if their calorie count fell below certain thresholds.  *See* 21 C.F.R. § 105.66 (1989).  There is no dispute that Diet Pepsi met those requirements, and that it does so to this day.  *See* FAC ¶ 15.

21 U.S.C. § 343(r)(2)(D) also provides that use of the term "diet" "is subject to" 21 U.S.C. § 343(a).  As relevant here, that FDCA provision—section 343(a)—prohibits labeling that is "false or misleading in any particular."  *Id.* § 343(a).

Finally, the NLEA includes an express preemption provision.  *See Id.* § 343-1.  As relevant here, it prohibits state or local governments from imposing "any requirement respecting any claim . . . made in the label or labeling of food that is not identical to the requirement of section 343(r)"—*i.e.*, the provision addressing nutrition- and health-related label claims, of which § 343(r)(2)(D) is a subsection.  *Id.* § 343-1(a)(5).  Significant here, the NLEA's preemption provision does not apply to § 343(a), the FDCA's prohibition on false or misleading labeling.

In 1993, following passage of the NLEA, the FDA issued a new implementing regulation tracking the language of § 343(r)(2)(D):  "A soft drink that used the term diet as part of its brand

name before October 25, 1989, and whose use of that term was in compliance with § 105.66 of this chapter as that regulation appeared . . . on that date, may continue to use that term as part of its brand name, provided that its use of the term is not false or misleading under [21 U.S.C. § 343(a)]." 21 C.F.R. § 101.13(q)(2).

## 2. Discussion

In 1990, Congress authorized the continued use of the term "diet" by then-compliant soft drinks, with the caveat that such use would remain authorized so long as it was not false or misleading. *See* 21 U.S.C. § 343(r)(2)(D). There is no indication that upon enactment of the NLEA, Congress viewed legacy soft drinks' use of the term "diet" as false or misleading. *See* Opp. at 8 n.1. Likewise, the FDA has not only authorized continued use of the term "diet," but has also indicated that it was unaware of any planned line extensions that would not conform with 21 C.F.R. § 105.66. *See* Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2,302, 2,313 (Jan. 6, 1993).[2]

Accordingly, a plaintiff challenging a legacy soft drink's use of the term "diet" as false or misleading faces a significant obstacle. Congress and the FDA determined, to the extent of the information available to them in 1990 and 1993 respectively, that the nutrient content claim "diet," standing alone, was not false or misleading as applied to then-compliant soft drinks containing NNS. It follows that a claim challenging such use of the term, if based solely on information available to Congress and the FDA before 1993, is preempted. Whether viewed as a matter of express preemption under § 343-1(a)(5), or as implied preemption on the theory that a

---

[2] The FDA has also not voiced concern about the effects of NNS on weight management. On the contrary, it has expressly authorized use of NNS in foods purporting to be "useful[] in reducing or maintaining body weight." *See* 21 C.F.R. § 105.66(a), (b), (e).

challenge based on the identical information before Congress and the FDA necessarily conflicts with their considered judgment, such claims, without more, cannot support liability. *See Red v. The Kroger Co.*, No. 10-cv-1025 DMG (MANx), 2010 WL 4262037, at *5 (C.D. Cal. Sept. 2, 2010) (a nutrient content claim that is expressly permitted under federal law cannot be false or misleading).

This challenge, however, is different. Plaintiffs here claim that developments after the early 1990s—specifically, PepsiCo's marketing campaigns and the current state of scientific knowledge—today make PepsiCo's use of the term "diet" false or misleading.

For the reasons that follow, a claim to that effect—whatever its merit—is not preempted.

In 1990 and 1993, respectively, Congress and the FDA authorized continued use of the term "diet" only provisionally. Section 343(r)(2)(D) subjects legacy soft drinks' use of the word "diet" to § 343(a), which prohibits false or misleading labeling. And § 343(a), unlike § 343(r), has no preemptive force. *See* 21 U.S.C. § 343-1; *see also Dr Pepper*, 2018 WL 1569697, at *4; *Coca-Cola*, 2018 WL 1070823, at *2–3.

PepsiCo responds that this argument misreads § 343(r)(2)(D). That provision, PepsiCo explains, merely exempts diet soft drinks from the labeling requirements of § 343(r)(2)—not from § 343(r) altogether. *See* 21 U.S.C. § 343(r)(2)(D) (excluding diet soft drinks from "[s]ubparagraph (2)"). Accordingly, PepsiCo argues, use of the word "diet" on soft drink labels remains subject to § 343(r) as a nutrient content claim, and therefore remains subject to § 343-1's preemptive force. *See* Mem. at 10–11; Reply at 6–7.

Although perhaps a technically accurate description of the statutory structure, this argument ultimately does not achieve the preemption that PepsiCo seeks here. That is because the NLEA's preemption provision preempts only those state-law requirements "not identical to

the requirement of section 343(r)."  21 U.S.C. § 343-1(a)(5).  And § 343(r) itself incorporates § 343(a), which prohibits false or misleading labeling.  Thus, where a plaintiff brings claims against PepsiCo for its use of the word "diet" under state laws that prohibit false or misleading labeling, those claims, tracking as they do the standard set in § 343(a), are not preempted.  *See Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 64 (2d Cir. 2006) ("[T]he federal government's intent to preempt substantive state-law *standards* does not necessarily imply an intent to preempt state-law *remedies* for violations of federal standards.").

PepsiCo responds that the state consumer protection laws invoked here—purportedly targeted at false or misleading statements, *see infra* Part III.C—are nevertheless preempted because they would impose broader obligations on PepsiCo than those required by § 343(a).  *See* Mem. 11–12; *see also In re PepsiCo, Inc. Bottled Water Mktg. and Sales Practices Litig.*, 588 F. Supp. 2d 527, 534 (S.D.N.Y. 2008) (state-law claims are preempted if they "impose a broader obligation than federal law" (quoting *Bates*, 544 U.S. at 453)).  In PepsiCo's view, § 343(a), as incorporated by § 343(r)(2)(D), provides a remedy only against the surreptitious introduction of high-calorie sweeteners into legacy "diet" soft drinks.  *See* Mem. at 6–7.  PepsiCo thus reads this section, in the context of challenges to the use of the word "diet" to describe a legacy soft drink, to prohibit only false or misleading statements as to the drink's *calorie content*.

In support, PepsiCo points first to the FDA's statement that it would regard a label as false and misleading if it falsely stated that a food was a formulated meal replacement, so as to avoid the calorie content requirements associated with the term "diet."  *See* Food Labeling: Label Statements on Foods for Special Dietary Use, 58 Fed. Reg. 2,427, 2,428 (Jan. 6, 1993).  PepsiCo reads this example to mean that "diet" binds a soda manufacturer only as to calorie content.  But while the term "diet" surely implies calorie content restrictions, it does not follow that the only

form of cognizable misstatements with respect to a "diet" label are those as to calorie content. The statute is not fairly read to make a misstatement as to calorie content a necessary—as opposed to sufficient—condition for liability under § 343(a) and (r)(2)(D).

PepsiCo next argues that, because the federal labeling regime has expressly authorized use of the term "diet" in reduced-calorie products, any state regulation that could be implied to make use of that term a basis for liability is necessarily inconsistent with—and preempted by—federal law.  *See* Mem. at 12.  But as explained above, the statute has authorized use of the term "diet" only provisionally, even for soft drinks like Diet Pepsi that are grandfathered under § 343(r)(2)(D).  Congress there has *prohibited* any false or misleading use of the term "diet," even on grandfathered drinks.  Whatever the likelihood or unlikelihood of such a scenario, it follows that, if future science or other circumstances were to support a claim that that term was now false or misleading as applied to soft drinks sweetened with NNS, the prohibition on false and misleading labels in the federal labeling regime would then be triggered, and any identical state-law claims would not be preempted.

In any event, PepsiCo's narrow reading of "false or misleading," which would preempt state-law claims other than those alleging an inaccurate calorie count, fails as a matter of statutory and regulatory construction.  It is contrary to the text of § 343(a), which broadly prohibits statements that are false or misleading "*in any way*"—not just statements that mislead in relation to other requirements of the FDCA.  It is also inconsistent with 21 C.F.R. § 105.66(e)(1), which, for soft drinks marketed after October 25, 1989, *see* 21 C.F.R. § 101.13(q)(2), requires both that the term "diet" not be false or misleading, and that the label contain a "comparative calorie claim" in compliance with the calorie content requirements of 21 C.F.R. § 101.60.  The regulations for post-1989 diet soft drinks thus treat "false and misleading"

as a *separate* requirement from calorie content requirements. On PepsiCo's view of preemption, therefore, the term "false and misleading" would have different meanings as applied to soft drinks marketed before and after 1989, allowing manufacturers of the former but not the latter to engage in false and misleading labeling *other than* as to calorie content. There is no basis to assign to Congress such an intent. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (in a "symmetrical and coherent regulatory scheme," "operative words have a consistent meaning throughout").

Thus, whatever its merits, plaintiffs' claim that changed circumstances today make PepsiCo's use of the term "diet" false and misleading so as to violate state law is not preempted. The Court therefore turns to PepsiCo's other arguments.

### B.      Primary Jurisdiction

PepsiCo next contends that this Court should dismiss or stay this case pursuant to the primary jurisdiction doctrine.

"Despite its name, the doctrine is not jurisdictional." *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 324 (S.D.N.Y. 2017). Rather, "[t]he doctrine of primary jurisdiction is concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)). Its "central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they do not work at cross-purposes." *Id.* (quotation marks omitted).

As such, the doctrine has a "relatively narrow scope," *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 851 (2d Cir. 1988), and "should generally be reserved for resolution of an issue of first impression, or a particularly complicated issue that Congress has committed to

a regulatory agency," *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 724 (S.D.N.Y. 2015) (quotation marks omitted). Although there is no bright-line test, this Circuit applies a "case-by-case" analysis mindful of four factors: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *Ellis*, 443 F.3d at 82–83.

As to the first factor, it is true that a scientific question underlies this dispute: the nutritional impact of artificial sweeteners. But at bottom, this case is "far less about science than [it is] about whether a label is misleading, and the reasonable-consumer inquiry upon which . . . the claims . . . depend[] is one to which courts are eminently well suited, even well versed." *In re Kind LLC "Healthy and All Natural" Litig.*, 209 F. Supp. 3d 689, 694–95 (S.D.N.Y. 2016) (quoting *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413 (RLM), 2013 WL 4647512, at *8 (E.D.N.Y. Aug. 29, 2013)). The Court is therefore "reluctant to declare that issues of alleged consumer deception are necessarily outside the conventional wisdom of judges (or even juries)." *Id.* at 695; *see also Ault v. J.M. Smucker Co.*, No. 13 Civ. 3409 (PAC), 2014 WL 1998235, at *5 (S.D.N.Y May 15, 2014) (same).

The second factor is more equivocal. Congress has authorized the FDA to promulgate regulations regarding "diet" soft drink labeling. *See* 21 U.S.C. § 343(r)(2)(D). And because the FDA may prohibit labels that are "false or misleading in any particular," the dispute about PepsiCo's labels might "seem[] to be particularly within the FDA's discretion." *In re KIND LLC*, 209 F. Supp. 3d at 695. These considerations, however, do not carry the day here. In

2015, a group known as Right to Know applied to the FDA to resolve the very issue presented here. *See* Melamed Decl. Ex. 13. The agency declined the invitation. *See* Melamed Decl. Ex. 5 (explaining that requests for enforcement actions are not proper subjects of a citizen petition). Accordingly, whatever the scope of the FDA's discretion, every indication is that the FDA will not exercise that discretion as to the matter at hand.

Similarly, as to the third factor, given that the FDA has declined to take up the question presented here, there is no danger of inconsistent rulings. The Second Circuit has advised that "[c]ourts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues." *Ellis*, 443 F.3d at 88. But when the "agency is *not* simultaneously contemplating the same issue . . . this factor weighs against applying the primary jurisdiction doctrine." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 477 (S.D.N.Y. 2014) (citation omitted). PepsiCo notes that several other *courts* are currently considering "the use of the term 'diet'" and therefore fears divergent results in different districts. *See* Mem. 15–16. But "decisions from various district and appellate courts regularly conflict." *Goldemberg*, 8 F. Supp. 3d at 477. The potential for such conflict is unavoidable absent action by the FDA or a resolution by the nation's highest court.

Finally, for much the same reasons, the fourth factor counsels against dismissing or staying the case. True, "prior application to the agency"—such as the one submitted by Right to Know—ordinarily supports application of the primary jurisdiction doctrine. *See Ellis*, 443 F.3d at 89. But as noted, the FDA squarely rejected Right to Know's application. As the Second Circuit has recognized, "where resort to the agency would plainly be unavailing in light of its manifest opposition, . . . courts need not bow to the primary jurisdiction of the administrative body." *Ellis*, 443 F.3d at 90 (quoting *Bd. of Educ. v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979)).

"Similarly, primary jurisdiction is not required when a referral to the agency would significantly postpone a ruling that a court is otherwise competent to make." *Canale*, 258 F. Supp. 3d at 324 (quotation marks omitted). In such circumstances, "[c]ommon sense" dictates that even if the FDA's "expertise would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation." *Id.* (quotation marks omitted). This Court therefore declines to invoke primary jurisdiction here.

## C. Merits

The Court turns now to PepsiCo's argument that plaintiffs' allegations must be dismissed for failure to state a claim under Rule 12(b)(6). The Court so holds for two independent reasons: First, the FAC is based on a strained and artificial interpretation of the phrase "Diet Pepsi" that no reasonable consumer would adopt. Second, the FAC does not plausibly allege that PepsiCo's representations were actually deceptive.

### 1. Plaintiffs' Strained Interpretation of "Diet"

The FAC's claims under New York law each require establishing a false or misleading statement.[3] (Indeed, as discussed above, to be within the scope of permissible state regulation under 21 U.S.C. § 343-1, a plaintiff's claims *must* allege a false or misleading representation.)

Under New York law, in the consumer protection context, a statement is deceptive only if it is likely to mislead a reasonable consumer. *See Fink v. Time Warner Cable*, 714 F.3d 739, 741

---

[3] *See Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017) ("To assert a claim under either [New York General Business Law §§ 349 or 350], a plaintiff must establish that the defendant engaged in consumer oriented conduct that is materially misleading . . . ."); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) ("[A] claim for negligent misrepresentation requires the plaintiff to demonstrate . . . that the information [provided] was incorrect . . . ." (quotation marks omitted)); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 478, 484 (S.D.N.Y. 2012) ("To recover damages for fraud under New York law, a plaintiff must prove . . . a misrepresentation or a material omission of fact which was false and known to be false by defendant . . . ."); *see also* FAC ¶¶ 112, 119, 125 (breach of warranty claims premised on PepsiCo's misleading use of the word "diet").

(2d Cir. 2013); *Marcus v. AT&T Corp.*, 138 F.3d 46, 63–64 (2d Cir. 1998). "It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink*, 714 F.3d 739 at 741 (2d Cir. 2013).

Plaintiffs allege that PepsiCo's use of the term "diet" leads "consumers [to] reasonably believe that [Diet Pepsi] will assist in weight loss, or at least healthy weight management, for example, by not causing weight gain." FAC ¶ 16. Faced with identical claims against PepsiCo's competitors, Judges Alsup, Orrick, and Daniels have held that no reasonable consumer would understand a soft drink labeled as "diet" to be a weight-loss product. *See Coca-Cola*, 2018 WL 1070823, at *3 ("[A] reasonable consumer would simply not look at the brand name Diet Coke and assume that consuming it, absent any lifestyle change, would lead to weight loss."); *Dr Pepper*, 2018 WL 1569697, at *6 ("Nothing on the label, packaging, or advertising of Diet Dr Pepper makes the claim or even suggests that the product will assist in weight loss or healthy weight management."); *Excevarria*, 2018 WL 1569697, ECF. No. 56 at 82 ("The word 'diet' does not solely represent claims with regard to the loss of weight or the gain of weight by its use.").

The Court joins in this holding, for two reasons.

First, the FAC reads "diet" out of context. "[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink*, 714 F.3d at 742. Accordingly, "in resolving the reasonable consumer inquiry, one must consider the entire context of the label." *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) (quotation marks omitted).

Here, the word "diet" does not stand in isolation. "Diet" modifies "Pepsi." As the FDA has explained, where a term such as "low calorie" "immediately preced[es] the name of the

food," the juxtaposition naturally "impl[ies] that the food has been altered to lower its calories with respect to other foods of the same type." 21 C.F.R. § 105.66 (1989). Likewise here, "Diet" immediately precedes "Pepsi," and thereby connotes a *relative* health claim—that Diet Pepsi assists in weight management *relative to* regular Pepsi. While neither the FAC nor plaintiffs' brief in opposition so much as mentions regular Pepsi, reading "Diet Pepsi" without reference to Pepsi deprives the term "Diet" of its essential referent. *Cf. NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (Hand, J.) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used."). The FAC does not dispute that Diet Pepsi assists in weight management relative to regular Pepsi. On this basis alone, plaintiffs cannot maintain a claim that reasonable consumers have been deceived by the term "Diet Pepsi."

Second, even if the word "diet" may sometimes identify weight-loss products (as in "diet pills" or other products available in a pharmaceutical aisle), in the context of soft drinks, the term unambiguously signals reduced calorie content relative to the non-diet version of the drink in question. *See Coca-Cola*, 2018 WL 1070823, at *3 ("Reasonable consumers would understand that Diet Coke merely deletes the calories usually present in regular Coke, and that the caloric reduction will lead to weight loss only as part of an overall sensible diet and exercise regimen dependent on individual metabolism."). Dictionary definitions specifically defining "diet" in the context of soft drinks confirms this. *See, e.g.*, *Diet (adj.)*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/unabridged/diet (last visited May 14, 2018) ("1: reduced in calories or without calories," as in "a *diet* soft drink"); *Diet (n.)*, Oxford English Dictionary, http://www.oed.com/view/Entry/52421?rskey=LWJQfi&result=1&

isAdvanced=false#eid (last visited May 14, 2018) ("[O]f (esp. carbonated soft) drinks with reduced sugar content sold commercially, as *diet cola, diet Pepsi*, etc."); *Diet (n.)*, New Oxford American Dictionary, https://premium.oxforddictionaries.com/definition/english/diet (last visited May 14, 2018) (as modifier "([o]f food or drink) with reduced fat or sugar content: '*diet soft drinks*'").[4]

Consistent with the foregoing, in this litigation, PepsiCo initially moved to dismiss on the ground that no reasonable consumer could believe "Diet Pepsi was a weight-loss product." Dkt. 17 at 16. In response, plaintiffs amended their complaint to incorporate a series of undated, unsourced Diet Pepsi advertisements that allude or are claimed to allude to weight loss. *See* FAC ¶¶ 18–21. The FAC alleged that these advertisements "emphasize the beneficial effects of the product on body weight and composition," and thereby caused consumers to believe that the term "Diet" in "Diet Pepsi" connoted a weight-loss product. *Id.* ¶¶ 16–17. PepsiCo thereupon dropped its argument that the operative complaint had not identified any "affirmative statements" that Diet Pepsi "is specifically formulated and should be purchased and consumed for weight loss or weight management." Dkt. 17 at 17.

For several reasons, however, the advertisements contained in the FAC do not rescue that pleading. First, the advertisements convey no more than that regular consumption of Diet Pepsi has "beneficial effects" *relative to* regular consumption of high-calorie Pepsi. Second, even if a particular advertisement could be read otherwise, the message or implication of a commercial advertisement is not the measure of how a reasonable consumer would understand a nutrition label term like "diet." Advertisements no doubt inform consumer opinion. But plaintiffs have

---

[4] This definition accords with the federal regulatory requirements associated with use of the term "diet" prior to the NLEA's enactment. *See* 21 C.F.R. § 105.66 (1989).

not adequately alleged that a message that they might decode PepsiCo's advertisements to convey about the health benefits of Diet Pepsi fairly measures how a reasonable consumer would specifically understand the term "diet" as that term appears on a "Diet Pepsi" label.[5]

To be sure, for purposes of this motion, the Court must accept the FAC's claim that the two plaintiffs, Manuel and Grossman, drew the inference that Diet Pepsi assists in weight loss or weight management in an absolute sense, not merely relative to regular Pepsi. See FAC ¶¶ 54, 56. But a cause of action for false or misleading conduct cannot rest on an unreasonable reading of label or advertising at issue. *See Stewart v. Riviana Foods Inc.*, No. 16-cv-61157 (NSR), 2017 WL 4045952, at *10 n.22 (S.D.N.Y. Sept. 11, 2017) ("Satisfying the reasonable consumer standard requires more than a mere possibility that [the defendant's] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." (quotation marks omitted)). The "reasonable consumer" test is an objective one. *Goldemberg*, 8 F. Supp. 3d at 478. And, objectively, reasonable consumers, well acquainted with diet soft drink labels that plaintiffs admit are "ubiquitous," *see* FAC ¶ 1, surely understand that "diet" soft drinks are simply "lower calorie or calorie-free versions of their sugar-laden counterparts," *Dr Pepper*, 2018 WL 1569697, at *6.

The FAC therefore does not adequately plead deception. Because a reasonable consumer understands the "Diet" in "Diet Pepsi" to make—at most—a relative health claim in comparison to the non-diet variant of the same brand, a plausible claim of consumer deception would require more. It would require credible allegations—presumably based on scientific evidence—to the effect that consumption of Diet Pepsi frustrates weight loss efforts *relative* to commensurate

_____

[5] As explained below, the FAC does not allege that PepsiCo's advertisements are themselves false or misleading. *See infra* Part III.D.

consumption of regular Pepsi. Plaintiffs do not make any such allegation or direct the Court to evidence that would support such an allegation.

### 2. Actual Deception

The FAC fails to state a claim for a second, independent reason: Even if reasonable consumers would understand the "Diet" in "Diet Pepsi" to denote a weight-loss product—*i.e.*, a product that promotes weight loss in an absolute sense, not merely relative to regular Pepsi—the FAC does not allege (other than conclusorily) that Diet Pepsi actually frustrates weight loss for any segment of the population. Accordingly, even adopting a broader construction of "Diet" than is fairly attributed to the word "Diet" in "Diet Pepsi," the FAC fails to allege that this label is deceptive.

The FAC does allege that NNS are "likely to cause weight gain." FAC ¶ 42. It purports to base this conclusion on 14 scientific articles and studies. However, a review of these reveals that *none* claim that NNS consumption causes weight gain.[6] Instead, the studies point only to a non-causal association between NNS consumption and weight gain (or related health problems). *See* FAC ¶¶ 28–34. Each study in fact expressly disclaims any generalizable causal conclusion:

- "Our results . . . suggest that human individuals feature a personalized response to [NNS], possibly stemming from differences in their microbiota composition and function." Jotham Suez et al., *Artificial Sweeteners Induce Glucose Intolerance by Altering the Gut Microbiota*, Nature, Sept. 2014, at 5, *cited in* FAC ¶ 28, https://www.researchgate.net/publication/265791239_Artificial_Sweeteners_Induce_Glucose_Intolerance_by_Altering_the_Gut_Microbiota.

- "Whether [diet soda intake] exacerbated the [waist circumference] gains observed in participants is unclear . . . . [P]articipants' decisions to use [diet sodas] may have been driven by other factors . . . which increased [changes in waist circumference], yet were not captured in our analysis. Complete dietary intake data are not available for [study] participants; these results are thus unadjusted for caloric intake." Sharon Fowler et al., *Diet soda intake is associated with long-term increases in waist circumference in a bi-ethnic cohort of older adults: The San Antonio Longitudinal*

---

[6] Nor do the studies claim that NNS consumption has a negative causal effect on "healthy weight management." *See* Opp. at 22.

*Study of Aging*, 63 J. Am. Geriatrics Society 708 (2015), *cited in* FAC ¶ 29, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4498394/.

- "*There may be no causal relationship between* [*NNS*] *use and weight gain.*" Sharon Fowler et al., *Fueling the Obesity Epidemic? Artificially Sweetened Beverage Use and Long-term Weight Gain*, 16 Obesity 1894 (2008), *cited in* FAC ¶ 30, https://onlinelibrary.wiley.com/doi/full/10.1038/oby.2008.284.

- "BMI was only related [in children and adolescents] to consumption of diet carbonated beverages and milk, and those relationships were weak." Richard A. Forshee, et al., *Total beverage consumption and beverage choices among children and adolescents*, 54 Int'l J. Food Sci. & Nutrition 297 (2009), *cited in* FAC ¶ 31, https://www.ncbi.nlm.nih.gov/pubmed/12850891.

- "Controversy exists in the literature and it is unclear if type of beverage consumption is a major factor influencing overweight status of children and adolescent[s]." Janet W. Blum et al., *Beverage Consumption Patterns in Elementary School Aged Children across a Two-Year Period*, 24 J. Am. Coll. of Nutrition 93, 97 (2005), *cited in* FAC ¶ 32, https://www.researchgate.net/publication/7938098_Beverage_Consumption_Patterns_in_Elementary_School_Aged_Children_across_a_Two-Year_Period.

- "[O]bservational data suggest that routine consumption of [NNS] may be associated with a long-term increase in BMI and elevated risk of cardiometabolic disease; however, these associations have not been confirmed in experimental studies and may be influenced by publication bias." Meghan B. Azad et al., *Nonnutritive sweeteners and cardiometabolic health*, 189 Can. Med. Ass'n J. E929 (2017), *cited in* FAC ¶ 33, http://www.cmaj.ca/content/189/28/E929.

- "[C]aution should be taken in interpreting these results as causal because both residual confounding and reverse causation could explain these results." Mengna Huang et al., *Artificially sweetened beverages, sugar-sweetened beverages, plain water, and incident diabetes mellitus in postmenopausal women*, 106 Am. J. Clinical Nutrition 614 (2017), *cited in* FAC ¶ 34, https://academic.oup.com/ajcn/article-abstract/106/2/614/4557620.

- "Despite accumulating evidence of the existence of these associations, we are cautious not to conclude causality between diet soda and the diabetic or pre-diabetic condition. The possibility of confounding by other dietary and lifestyle/behavioral factors cannot be excluded from these observational studies." Jennifer A. Nettleton et al., *Diet Soda Intake and Risk of Incident Metabolic Syndrome and Type 2 Diabetes in the Multi-Ethnic Study of Atherosclerosis*, 32 Diabetes Care 688 (2009), *cited in* FAC ¶ 34, http://care.diabetesjournals.org/content/32/4/688.long.

The FAC also cites review articles extrapolating from existing studies. *See* FAC ¶¶ 24–27. But these articles, too, disavow causal inferences:

- "[I]ntervention trials consistently fail to document that NNS promote weight gain, and observational studies provide only equivocal evidence that they might. Reflecting these findings, conclusions from prior reviews are ambivalent about a contribution of NNS to weight gain." Richard D. Mattes, et al., *Nonnutritive sweetener consumption in humans: effects on appetite and food intake and their putative mechanisms*, 89 Am. J. Clinical Nutrition 1 (2009), *cited in* FAC ¶ 24, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2650084/.

- "Presently, there is no strong clinical evidence for causality regarding artificial sweetener use and metabolic health effects . . . ." Rebecca J. Brown et al., *Artificial Sweeteners: A systematic review of metabolic effects in youth*, 5 Int'l J. Pediatric Obesity 305 (2010), *cited in* FAC ¶ 25, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2951976/.

- "Recent reviews of studies spanning at least the past 40 years have concluded that high-intensity sweeteners are potentially helpful, harmful, or have as yet unclear effects with regard to regulation of energy balance or other metabolic consequences." Susan E. Swithers, *Artificial sweeteners produce the counterintuitive effect of inducing metabolic derangements*, 24 Trends Endocrinology & Metabolism 431 (2013) (citations omitted), *cited in* FAC ¶ 27, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3772345/.[7]

In law, as in science, "[c]orrelation is not causation." *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 173 (2003) (Kennedy, J., concurring in part and dissenting in part). Accordingly, even if the FAC had adequately alleged the frequency and quantity of plaintiffs' NNS consumption, or a plausible biological mechanism through which NNS consumption frustrates healthy weight management, *see* FAC ¶¶ 35–41, it does not make non-conclusory allegations that NNS consumption causes weight gain, or even a risk of weight gain.

---

[7] One "mini-review" cited at FAC ¶ 26 proposes that "research studies suggest that artificial sweeteners may contribute to weight gain." In support, however, it cites only cohort studies finding "positive correlation between artificial sweetener use and weight gain," childhood studies that either could not "differentiat[e] between artificial sweetener users and non-users" or indicated "the correlation between diet soda and BMI was not significant," and interventional studies suggesting only that "artificial sweeteners do not help reduce weight when used alone." Qing Yang, *Gain weight by 'going diet?' Artificial sweeteners and the neurobiology of sugar cravings*, 83(2) Yale J. Bio. & Med. 101–08 (June 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892765/.

For this reason, evaluating complaints based on the same articles and studies at issue here, Judges Alsup and Orrick reached a common conclusion: Plaintiffs' claims have outrun the science. *See Coca-Cola*, 2018 WL 1070823, at *4 ("With a conclusory wave of counsel's hand, [plaintiff] has overstated the actual science set forth in the citations."); *Dr Pepper*, 2018 WL 1569697, at *6 ("[T]he studies do not allege causation at all—at best, they support merely a correlation or relationship between artificial sweeteners and weight gain, or risk of weight gain. But correlation is not causation, neither for purposes of science nor the law." (citations omitted)).[8]

At bottom, plaintiffs have failed to allege a causal relationship between NNS consumption and weight gain. Without evidence of causation, plaintiffs cannot establish actual deception—*i.e.*, that contrary to their expectations, plaintiffs "received a beverage whose consumption is likely to lead to weight gain." FAC ¶ 61.

Perhaps one day, scientific research will support such a claim. In that event, plaintiffs may renew their challenge. *See L-Tec Elec. Corp. v. Cougar Elec. Org.*, 198 F.3d 85, 87–88 (2d Cir. 1999) (claims based on newly discovered evidence that could not have been discovered with due diligence are not barred by *res judicata*). Plaintiffs' FAC, however, rests on too spongy a foundation for such a theory of deception to be sustained as viably pled: The review articles cited in the FAC do no more than queue up for analysis by future researchers the issue whether

---

[8] To be sure, associational data, properly considered pursuant to reliable expert methodology, can, in conjunction with other evidence, sometimes suggest a likelihood of causation. *See, e.g.*, *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1128 (2d Cir. 1995) (citing A. Bradford Hill, *The Environment and Disease: Association or Causation,* 58 Proc. Royal Soc'y Med. 295, 295–300 (1965)). As to the issue here, however, no scientist cited by the FAC or counsel has found causality. *See* Brown et al., *Artificial Sweeteners*, *supra* ("Based on the [Bradford Hill] criteria, causality is far from established with regard to artificial sweetener use and weight gain in children.").

there is a causal relationship between NNS consumption and weight gain. Because the FAC asserts such a relationship as an *ipse dixit*, it fails to state a plausible claim of deception.

### D. False Advertising Claims

In view of the foregoing, plaintiffs' false advertising claim under New York General Business Law § 350, along with the rest of plaintiffs' claims, must be dismissed for failure to allege adequately that the term "Diet" in "Diet Pepsi" is false or misleading. Nevertheless, in the interest of completeness, the Court briefly addresses PepsiCo's separate, specific objection to plaintiffs' false advertising claim.

PepsiCo argues that that claim is independently defective (1) for failure to allege causation, in that plaintiffs do not claim to have seen the advertisements reprinted in the FAC, and (2) as time-barred. *See* Mem. at 19–21. These critiques might well have purchase in a case claiming that the reprinted advertisements were themselves false and misleading. But PepsiCo misconstrues the FAC's false advertising claim to so allege. The FAC bases its claim under § 350 solely on PepsiCo's use of the term "diet" in advertising its product. It does not challenge as actionable any print or video advertisement. *See* FAC ¶ 88 ("Pepsi's use of the term 'diet' in marketing Diet Pepsi is deceptive in light of the strong evidence that aspartame acesulfame-potassium and sucralose cause[] weight gain."). The advertisements quoted in the FAC are cited for a different purpose: to "show that PepsiCo's messaging in extra-label advertising was"— ostensibly—"consistent with Plaintiffs' interpretation of 'diet' in the product's brand name." Opp. at 23. In other words, these advertisements are offered to support plaintiffs' (unavailing) argument that a reasonable consumer would view Diet Pepsi as a weight-loss product, not as the basis for a stand-alone false advertising claim. Accordingly, PepsiCo's critiques do not supply an independent basis to dismiss the FAC's false advertising claim.

## IV.    Leave to Amend

The Court previously notified plaintiffs, prior to filing of the FAC, that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 19 at 1. Plaintiffs utilized their right to amend their pleadings to counter PepsiCo's arguments for dismissal of the original complaint. Accordingly, the FAC is dismissed with prejudice, subject of course to plaintiffs' right to bring future claims based on different or changed circumstances.

## CONCLUSION

Plaintiffs' request for oral argument is denied as moot. *See* Dkt. 40. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 27 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: May 17, 2018
       New York, New York